# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TERRY LYNN PUCKETT,                                Case No. 1:10-cv-528
    Plaintiff                                 Barrett, J.
                                               Litkovitz, M.J.

    vs

COMMISSIONER OF                                    **REPORT AND**
SOCIAL SECURITY,                                   **RECOMMENDATION**
    Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 5), the Commissioner's response in opposition (Doc. 6), and plaintiff's reply

memorandum. (Doc. 7).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1961. Plaintiff has a ninth-grade education and has no past relevant

work experience, but has worked as a dishwasher and temporary laborer. (Tr. 23, 73, 77, 80).

Plaintiff filed an SSI application on November 22, 2005, alleging disability since November 22,

2005, due to seizures, depression and bipolar disorder. (Tr. 59-63, 76). Plaintiff's application

was denied initially and upon reconsideration. Plaintiff then requested and was granted a de

novo hearing before an administrative law judge (ALJ). On November 6, 2008, plaintiff, who

was represented by counsel, appeared and testified at a hearing before ALJ Deborah Smith. (Tr.

262-76). Danielle Lockett, plaintiff's case manager, also testified. (Tr. 276-82). A vocational

expert (VE), Micha Daoud, also appeared and testified at the hearing. (Tr. 283-89).

On December 2, 2008, the ALJ issued a decision denying plaintiff's SSI application.  (Tr. 16-25).  The ALJ determined that plaintiff suffers from the severe impairments of seizures, personality disorder, alcoholism (reportedly in remission), and depression.  (Tr. 18).  The ALJ next determined that plaintiff does not have an impairment or combination of impairments that meets or equals the requirements of any impairment set forth in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ determined that plaintiff retains the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: he should avoid concentrated exposure to hazards (machinery, heights, etc).  He is capable of completing simple step tasks and does not appear to have great difficulties with concentration.  He might have some difficulty working with the public or large groups but should be able to relate adequately to coworkers on a one-on-one basis.  (Tr. 19).  The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with plaintiff's RFC.  (Tr. 20).  Based on the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff could perform given his age, education, work experience, and RFC.  (Tr. 24).  Consequently, the ALJ concluded that plaintiff is not disabled under the Social Security Act and therefore not entitled to SSI.  *Id.*

Plaintiff's request for review by the Appeals Council was denied (Tr. 5-8), making the decision of the ALJ the final administrative decision of the Commissioner.

**APPLICABLE LAW**

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).

The Court's sole function is to determine whether the record as a whole contains substantial

evidence to support the Commissioner's decision. The Commissioner's findings stand if they

are supported by "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated

Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's

findings are supported by substantial evidence, the Court must consider the record as a whole.

*Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as

defined in the Social Security Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is

dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To

establish disability, plaintiff must demonstrate a medically determinable physical or mental

impairment that can be expected to last for a continuous period of not less than twelve months.

Plaintiff must also show that the impairment precludes him from performing the work he

previously performed or any other kind of substantial gainful employment that exists in the

national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process

for disability determinations. 20 C.F.R. § 416.920. First, the Commissioner determines whether

the individual is currently engaging in substantial gainful activity; if so, a finding of

3

nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 416.920(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 416.925(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 416.920(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

4

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson* v. *Commissioner of Social Security,* 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born* v. *Secretary of Health and Human Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff s individual capacity to perform alternate work considering plaintiffs age, education, and background, as well as the job requirements. *Wilson,* 378 F.3d at 548. *See also Richardson* v. *Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson,* 378 F.3d at 548.

A mental impairment may constitute a disability within the meaning of the Act. *See 42 U.S.C.* §§ 423(d)(l)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 416.920a. The special procedure also applies when Part A of the Listing is used for an individual under age 18. *Id.* At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers* v. *Commissioner Social*

5

*Sec. Admin.,* 582 F.3d 647,653 (6th Cir. 2009) (citing 20 C.F.R. § 416.920a(b)(l)). If so, the

ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.*

(citing 20 C.F.R. § 416.920a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly

known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration,

persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P,

App. 1, § 12.00 et seq.; *Craft* v. *Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of

limitation in the first three functional areas is rated using the following five-point scale: None,

mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 416.920a(c)(4)). The degree of

limitation in the fourth functional area (episodes of decompensation) is rated using a four-point

scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas

as "none" or "mild" and the fourth area as "none," the impairment is generally not considered

severe and the claimant is conclusively not disabled. *Id.* (citing § 416.920a(d)(1)). Otherwise,

the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing §

416.920a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's

impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant

whose impairment meets the requirements of the Listing will be deemed conclusively disabled.

*Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets

nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before

completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. §

416.920a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters* v. *Comm'r of Soc. Sec.,* 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris* v. *Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 416.927(d)(2); *see also Blakley* v. *Commissioner,* 581 F.3d 399, 406 (6th Cir. 2009); *Wilson,* 378 F.3d at 544. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from

reports of individual examinations, such as consultative examinations or brief hospitalizations."

20 C.F.R. § 416.927(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ

must consider a number of factors when deciding what weight to give the treating source's

opinion. 20 C.F.R. § 416.927(d). These factors include the length, nature and extent of the

treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(d)(2)(i)(ii);

*Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source,

how well-supported by evidence the opinion is, how consistent the opinion is with the record as a

whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §

416.927(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth

in § 416.927(d)(3)-(6) when considering the weight to give a medical opinion rendered by a

non-treating source. 20 C.F.R. § 416.927(d). When considering the medical specialty of a

source, the ALJ must generally give "more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a

specialist." 20 C.F.R. § 416.927(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must

decide whether to reverse and remand the matter for rehearing or to reverse and order benefits

granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision

"with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v.*

*Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at

steps one through four of the sequential evaluation, remand is often appropriate so that the

8

sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE[1]

Plaintiff presented to the University of Cincinnati Hospital (UCH) Psychiatric Emergency Service for a suicide attempt in January 2004. (Tr. 182-88). Plaintiff reported that he was depressed and complained of auditory and visual hallucinations. He had tried to kill himself by turning on the gas at his cousin's house. *Id.*

---

[1]Plaintiff reported a history of seizures. (Tr. 271-73). However, his statement of errors focuses solely on his mental impairments. Therefore, the Court shall limit its recitation of the medical evidence accordingly.

Plaintiff presented to the emergency room at UCH in July 2005 for paranoid thoughts, with no-to-vague suicidal ideation. (Tr. 159-67). He reported that he had been hearing voices for the past seven and one-half years, but has never mentioned this to any doctor. (Tr. 163). He was found to be at low risk for suicide completion. *Id.*

In August 2005, plaintiff was evaluated at CORE Behavioral Healthcare (CORE). (Tr. 233-39). Plaintiff was given the antipsychotic medication, Zyprexa, but still reported frequent thoughts of suicide. He was diagnosed with major depressive disorder, recurrent, severe with psychotic features; alcohol abuse in remission; and a personality disorder. He was assigned a Global Assessment of Functioning (GAF) score of 50.[2] (Tr. 234–36).

Plaintiff continued to receive care at CORE in September, October and December 2005 from Nurse Practitioner Wheeler. (Tr. 223-32). Treatment notes from September 2005 reflect that plaintiff had an apparent deficit in expressive language skills, poor memory and concentration, and a repetitive thought pattern. (Tr. 232). He was having auditory hallucinations. Nurse Practitioner Wheeler reported that plaintiff had poor short-term memory with some organicity, and impaired insight and judgment. Plaintiff was diagnosed with major depressive disorder with psychotic features. Nurse Practitioner Wheeler described plaintiff as isolating because he feared people, and noted that plaintiff had been unable to work for the prior two years. (Tr. 230). She noted that his alcohol abuse was in full remission. (Tr. 229-30). In

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with scores of 41 to 50 as having "serious" symptoms. *See* DSM-IV at 32.

October 2005, Nurse Practitioner Wheeler noted that while plaintiff heard fewer voices, he was still unmotivated and isolated, and at times had suicidal thoughts. He had poor to fair concentration and focus with a sad, anxious affect. (Tr. 227). He was medication compliant. (Tr. 228). In December 2005, Nurse Practitioner Wheeler reported that plaintiff was sleeping better, had a decrease in auditory hallucinations, and had fewer suicidal ideations. (Tr. 222). He was living in a homeless shelter. The content of his speech was disorganized, mood and affect were congruent, concentration and focus were poor, and insight and judgment were limited. (Tr. 222). He was medication compliant. (Tr. 222).

David Chiappone, Ph.D., a medical consultant, examined plaintiff in January 2006. (Tr. 128-32). Plaintiff reported to Dr. Chiappone that he had been fired from his janitorial job because of his seizures, but that he had been able to follow instructions, maintain pace, and maintain attendance. (Tr. 128). Plaintiff also reported that he last drank alcohol in early to mid-2005, and that he used to drink a gallon of beer on the weekends. (Tr. 129). Plaintiff noted that he lived in a shelter but stated that he could perform a number of activities of daily living. *Id.* Dr. Chiappone diagnosed plaintiff with psychotic disorder, major depression, alcohol abuse, and borderline intellectual functioning. Plaintiff was assigned a GAF score of 48. (Tr. 131). Dr. Chiappone opined that plaintiff could understand simple one and two-step job instructions, that he had no more than mild impairments in his ability to maintain concentration and attention, and that he was mildly to possibly moderately impaired in his ability to relate to others. (Tr. 130-31). Dr. Chiappone explained that plaintiff would not have major difficulty relating one-on-one, but would have difficulty dealing with groups. (Tr. 131). Dr. Chiappone also opined that plaintiff is

moderately impaired in his ability to carry out and persist over time due to depression and thought disorder, and that plaintiff has a moderately reduced stress tolerance. (Tr. 131).

On February 6, 2006, plaintiff was seen for a medication evaluation by Nurse Practitioner Wheeler. Nurse Practitioner Wheeler noted that plaintiff was living in a homeless shelter. (Tr. 220-21). While there was a decrease in auditory hallucinations, they were not completely extinguished. The content of his speech was often without focus or repetitive. His mood and affect were congruent and his insight and judgment were limited. He remained with an expressive language deficit and moderate impulsivity. *Id.* It was noted that he was medication compliant. (Tr. 220). That same date, Nurse Practitioner Wheeler completed a mental functional capacity assessment and opined that, out of twenty work-related mental functions, plaintiff had no significant limitations in eight; moderate limitations in eleven; and a marked limitation in one. (Tr. 203-04).

William Benninger, a state agency non-examining consultant, evaluated the severity of plaintiff's impairments and concluded that plaintiff had mild limitations in his activities of daily living and moderate limitations in both his social functioning and in maintaining concentration, persistence or pace. (Tr. 134-44). The consultant reported that plaintiff could complete "simple step tasks" and did not have great difficulties with concentration. He also opined that plaintiff could relate adequately on a one-on-one basis but might have some difficulties working with the public or large groups. (Tr. 150).

On February 23, 2006, plaintiff presented to the emergency room after he was assaulted. (Tr. 153-55). Plaintiff reported drinking alcohol daily and was found by the attending physician to be "clinically intoxicated." (Tr. 154).

When updating his Individualized Service Plan in March 2006, Nurse Practitioner Wheeler stated that plaintiff did well keeping his nurse practitioner appointments, taking his medications as prescribed, and reporting his symptoms to his case manager and nurse practitioner. (Tr. 219). She reported plaintiff maintained minimal progress towards his long term goals of remaining sober, attending AA meetings, and meeting with his case manager to discuss his symptoms and progress. (Tr. 219).

Plaintiff saw Dr. Rosenthal at CORE in June 2006 and reported that he had run out of medication. Dr. Rosenthal noted that plaintiff "relates well" and is "able to express thoughts." (Tr. 215-16). In June 2007, Dr. Rosenthal reported that plaintiff had fewer auditory hallucinations and that his mood and behavior were "relatively stable." (Tr. 253-54).

Plaintiff was next seen at CORE in May 2008. He reported that he had not been there since June of 2007 and wished to be back on medication. (Tr. 251-52).

On September 17, 2008, plaintiff was examined by Dr. Tadepalli, a psychiatrist at CORE. Dr. Tadepalli reported that plaintiff still had occasional hallucinations and got frustrated easily. Dr. Tadepalli reported that on examination, plaintiff exhibited fair insight and judgment, poor concentration, and poor recall. (Tr. 249).

On September 17, 2008, Dr. Tadepalli completed a Mental Functional Capacity Assessment and opined that, out of twenty work-related mental functions, plaintiff had no significant limitations in nine, moderate limitations in five, and marked limitations in five. Dr. Tadepalli concluded that plaintiff was unemployable. (Tr. 245).

When updating his Individualized Service Plan on October 3, 2008, plaintiff reported that he had been sober for over two years and stated that although "it is hard sometimes to deal with

people," his "medication works wonders." (Tr. 246-47). It was noted that plaintiff was medication compliant and very active in his medical treatment. *Id.*

On October 16, 2008, Dr. Tadepalli opined that plaintiff could understand, remember and complete simple job instructions and could function independently but had no useful ability to function with respect to work-related tasks that involved interaction with others. (Tr. 242-44). He concluded that plaintiff was "unable to return to work." (Tr. 244).

On October 30, 2008, Dr. Tadepalli stated that plaintiff was unable to work due to his extreme difficulty interacting in public with others. Dr. Tadepalli observed that plaintiff has difficulty managing his focus and concentration when out in public. (Tr. 241).

## THE ADMINISTRATIVE HEARING

Plaintiff testified at the November 2008 administrative hearing that he lived alone, never drove, and used public transportation. (Tr. 263). He walked to the hearing. *Id.* Plaintiff said that he could not work due to his schizophrenia, which made him suspicious and scared of others and also affected his concentration. (Tr. 264). He testified he always has had trouble being around people.

When questioned about use of alcohol, plaintiff testified that he stopped using alcohol four and a half years prior to the hearing. (Tr. 265-66). He testified that sometimes he drank to try to shake off the voices or to try to have a little control to be able to "handle things." (Tr. 266). He testified that his drinking wasn't excessive. *Id.* When questioned about alcohol use or alcohol abuse in his record after 2004, the plaintiff explained "they might assume that because of maybe the way they fill out their policies if somebody had drunk everyday." (Tr. 267).

14

Plaintiff testified that his medication helped him function but that he still heard voices about every other day. (Tr. 268).

Plaintiff stated on an average day he would watch television and "just sit in the house." (Tr. 269). Plaintiff testified that he is reluctant to go out alone, but that his cousin usually helped him when he left the house. *Id.* Plaintiff also testified that he had a case manager who helped him for 4 years with his appointments, helped him take care of his business, and explained things to him. (Tr. 274).

Danielle Lockett also testified at the administrative hearing on plaintiff's behalf. Ms. Lockett testified that she had been plaintiff's case manager since January 2008. (Tr. 274). Ms. Lockett testified that she spoke to plaintiff on the phone at least once a month, and had previously been seeing him once or twice a month. (Tr. 276). Plaintiff usually calls if he needs help. *Id.* Plaintiff has complained to her of hearing voices, but that the medicine does help. *Id.* She testified that plaintiff was reluctant to go out in public, but that he did really well with his shopping as long as he had assistance. (Tr. 277). She noted that plaintiff shelters himself a lot. *Id.* Ms. Lockett confirmed that plaintiff is compliant with his medication, which she appreciated in her position because a lot of people do not really realize the importance of medication. (Tr. 278).

Ms. Lockett testified that she is not aware of any impairment caused by substance abuse. *Id.* Ms. Lockett also testified that it would not be conducive for plaintiff to work due his symptoms. (Tr. 280). He gets "very agitated" and needs to be redirected. (Tr. 280-81).

The ALJ's hypothetical question to the VE assumed an individual who was physically limited to no work around heights, hazards or dangerous machinery, no climbing or driving, and

no work around ladders, ropes and scaffolds. From a mental standpoint, the hypothetical individual could complete simple step tasks and did not have great difficulties with concentration. The hypothetical individual could also relate adequately on a one-on-one basis but might have some difficulties working with the public or large groups. (Tr. 283-84). The VE responded that an individual of plaintiff's age, education, and work history with those limitations could perform cleaning jobs at the medium exertional level with 11,865 jobs available in the regional economy and 1,819,220 in the national economy, and at the light exertional level, with 3,540 jobs available in the regional economy and 572,460 in the national economy. (Tr. 284-85). The VE further testified that about half of these jobs were night cleaning jobs with little to no exposure to others. (Tr. 284-85, 287). The VE noted that clerical jobs would also be available, and that they also would not need to interact with others to perform those jobs. (Tr. 285, 288). If the hypothetical individual were limited as assessed by Dr. Chiappone, he could still perform the cleaning and clerical jobs. (Tr. 285-86).

## OPINION

Plaintiff assigns three errors in this case. First, plaintiff contends the ALJ erred by failing to apply Social Security Regulation (SSR) 96-2p and by rejecting the opinions of every treating source. (Doc. 5 at 4). Second, plaintiff argues the ALJ erred by relying on the RFC of a non-examining doctor who did not review the full record and by relying on a hypothetical that failed to accurately portray plaintiff's limitations. (*Id.* at 13). Third, plaintiff contends his mental impairments meet Listing 12.04(C)(2) and (3). (*Id.* at 14).

For the reasons that follow, the Court determines the ALJ's decision is not supported by substantial evidence and should be reversed and remanded for further proceedings.

16

## I.  Weight to treating source opinions

Plaintiff contends the ALJ failed to give appropriate weight to treating psychiatrist Dr. G. Tadepalli, M.D., treating Nurse Practitioner Wheeler, and case manager Danielle Lockett.  In a narrative statement dated October 30, 2008, both Dr. Tadepalli and Ms. Lockett opined that plaintiff is not able to work, has "extreme difficulty interacting in public with others," and has difficulty focusing and concentrating under these conditions.  (Tr. 241).

On October 16, 2008, Dr. Tadepalli completed a medical assessment of ability to do work-related activities (psychological) and opined that plaintiff was "extremely limited" (defined as "no useful ability to function in this area") in his ability to deal with work stresses and relate to co-workers, and that he becomes very agitated if he doesn't understand something. (Tr. 242).  He found plaintiff "markedly" limited in his ability to relate predictably in social situations.  (Tr. 243).  Dr. Tadepelli's treatment note from September 17, 2008 showed that plaintiff's diagnosis is Major Depressive Disorder with Psychotic Features, and that he still tended to get frustrated, had occasional auditory hallucinations, fair mood, insight and judgment, and "poor" concentration and recall.  (Tr. 249).

Nurse Practitioner Wheeler, in a February 2006 mental functional capacity assessment, opined that plaintiff was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  She also opined that plaintiff was moderately limited in eleven areas of understanding and memory, sustained concentration and persistence, and social interaction.  (Tr. 203-04).

The Commissioner argues that the ALJ did not err in weighing the treating source opinions.  The Commissioner contends that the opinions of Nurse Practitioner Wheeler and case

17

manager Lockett were not entitled to any special deference because neither a nurse practitioner nor a case manager is an "acceptable medical source" under the Social Security regulations. *See* 20 C.F.R. §§ 416.913(a), (d); 416.927(a)(2), (d). The Commissioner also contends that Dr. Tadepalli was not a treating physician and therefore his assessment was entitled to no special weight. The Commissioner asserts "there is not one treatment note in the record attributable to Dr. Tadepalli, and there is no document indicating the nature and scope of the purported treatment relationship." (Doc. 6 at 8).

Contrary to the Commissioner's assertion, the record does show that Dr. Tadepalli examined plaintiff on September 17, 2008, and that he is a treating physician. (Tr. 249-50). "A physician qualifies as a treating source if the claimant sees [him] 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.' 20 C.F.R. § 404.1502. A physician seen infrequently can be a treating source 'if the nature and frequency of the treatment or evaluation is typical for [the] condition.' *Id*." *Smith v. Commissioner of Social Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).

Although there is only one progress note showing an examination by Dr. Tadapalli in the record, plaintiff has been treated at CORE Behavorial Health (now Centerpoint Health)[3] since 2005. Thus, Dr. Tadepalli would have had access to progress notes of not only the previous treating doctor (Dr. Rosenthal), but the many years of progress notes from Nurse Practitioner Wheeler in assessing plaintiff's mental functional capacity. This would give Dr. Tadepalli an insight into plaintiff's mental impairments and functioning that a one-time examining physician

---

[3]In 2008, Centerpoint Health was formed from three mental health agencies, one of which was CORE Behavioral Health Centers, and is an affiliate of Talbert House. *See* http://www.centerpointhealth.org/about.html (last accessed on Aug. 8, 2011).

would not possess. *See Walker v. Secretary of Health and Human Services*, 980 F.2d 1066, 1070 (6th Cir. 1992) (treating physician is generally more familiar with patient's condition than are other physicians). In addition, the ALJ's decision appears to recognize Dr. Tadepalli as a treating source. *See* Tr. 23 (stating that while Dr. Tadepalli finds plaintiff is not using alcohol and takes medication as prescribed, plaintiff has not been truthful with his "treating sources" about use and compliance). The Court therefore rejects the Commissioner's contention that Dr. Tadepalli was not a treating physician whose opinion deserved special weight under the Social Security regulations.

The ALJ assigned "little weight" to the opinions of Dr. Tadepalli, Nurse Practitioner Wheeler, and case manager Lockett.[4] (Tr. 23). First, the ALJ noted that when plaintiff complies with his treatment his symptoms are "adequately managed." (Tr. 22). Second, the ALJ determined that plaintiff's inconsistent statements about his substance abuse called into question his credibility about his medication compliance and alcohol use. (Tr. 23). Third, with respect to Dr. Tadepalli only, the ALJ found that Dr. Tadepalli's reports are internally inconsistent, do not address plaintiff's noncompliance, and are inconsistent with treatment notes showing plaintiff does well when in treatment and compliant with his medications. (Tr. 23). Plaintiff contends

---

[4]The Commissioner is correct that SSR 06-03p recognizes that information from an acceptable medical source is required to establish the existence of a medically determinable impairment. However, information from "other sources" as defined under the regulations, such as a case manager or nurse practitioner, may be based on special knowledge of the individual and may provide insight into the severity of the impairment and how it affects the individual's ability to function. It may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. SSR 06-03p. In any event, the categorization of these source opinions is not relevant in this case because the ALJ did not cite this fact as reason to support her decision to discount the opinions of Nurse Practitioner Wheeler or case manager Lockett.

that none of the reasons posited by the ALJ are "good reasons" for rejecting the opinions of the treating sources under controlling Sixth Circuit authority. The Court agrees.

In support of her conclusion that plaintiff was noncompliant with medication, the ALJ cited to only two instances of alleged "noncompliance." The first was in July 2005, when plaintiff appeared at the psychiatric emergency service department at University Hospital. The notes show plaintiff had been off the medication Prozac for one year, was hearing voices, was fearful he would hurt himself, and had not left his cousin's apartment for two months. (Tr. 161-167). This was at a time *prior* to plaintiff's claimed onset date of disability and prior to a time when plaintiff had received any mental health treatment from CORE Behavioral Health. It is wrong to fault a mentally ill person for being "noncompliant" with medication when there is no evidence he was receiving or had been prescribed any medication for his mental illness.

The only other record cited by the ALJ subsequent to plaintiff's alleged onset date is a progress note from CORE Behavioral Health dated June 13, 2006. This note reflects that plaintiff had run out of his medication and reported increased nervousness, sleep problems, "so-so" appetite, and irritability. (Tr. 22, citing Tr. 215).

The ALJ contrasted these instances of "noncompliance" with times plaintiff was seemingly medication compliant. (Tr. 22). The ALJ stated that medication "controlled" his auditory hallucinations citing Tr. 230 (September 2005), Tr. 222-23 (December 2005), and Tr. 227 (October 2005). Yet, a review of the progress notes cited by the ALJ reflect that plaintiff's auditory hallucinations persisted despite taking his medication as prescribed. The record on September 2005 states that plaintiff's chief complaint was "hearing voices" and "feeling very sad," and that he reported "Zyprexa does *help* control auditory hallucinations *somewhat* but

20

feelings of helplessness continue." (Tr. 230) (emphasis added). The other progress notes show that plaintiff's auditory hallucinations were decreased, but not eliminated. (Tr. 222, 227).

In addition, these same notes the ALJ cited as showing "unequivocally" that plaintiff's symptoms are "adequately managed" when he takes his medication (Tr. 22) actually reflect that plaintiff continued to experience severe impairments in his functioning while medicated. The notes show plaintiff experienced deficits in his expressive language skills, poor memory and concentration, and a repetitive thought pattern (Tr. 232); plaintiff had poor short-term memory with some organicity, and impaired insight and judgment (Tr. 232); plaintiff was isolating himself because he feared people (Tr. 230); plaintiff's speech content was disorganized, his insight and judgment were limited, and his concentration and focus were poor (Tr. 222); and plaintiff experienced "still somewhat bad and racing thoughts," he was still unmotivated and isolated, at times he had suicidal thoughts, he had poor to fair concentration and focus, and he displayed a sad, anxious affect. (Tr. 227). The ALJ also stated that when plaintiff was medication compliant, he made progress toward finding housing, was sleeping better, had fewer suicidal ideations, and improved mood. (Tr. 22). However, the note showing that plaintiff was making progress with housing (Tr. 223), when taken in context, also indicates plaintiff was homeless at the time, living in a homeless shelter, and was looking into the possibility of a group home. (Tr. 222). The fact that plaintiff had "fewer" suicidal ideations indicates he still had ongoing thoughts of suicide. (Tr. 222, 227). Given the continuation of severe symptoms and clinical signs when plaintiff was seemingly medication compliant, the ALJ's conclusion that plaintiff's symptoms are adequately managed is not substantially supported by the record.

21

Finally, the ALJ's rationale appears to be premised on the notion that plaintiff's treating sources reported more extreme limitations in functioning than the non-reviewing state agency consultant because plaintiff was not truthful about his compliance with his medications.  But, aside from the two citations noted by the ALJ, the record is replete with progress notes affirmatively showing that plaintiff was compliant with his medications.  (Tr. 219, 220, 222, 228, 246-47).  In addition, plaintiff's case manager specifically testified that plaintiff has been "very compliant" with his medication regimen.  (Tr. 278).  Therefore, the two citations of medication "noncompliance," when taken in context of the record as whole, is not substantial evidence to support the ALJ's reason for discrediting the treating source opinions.[5]

The second reason the ALJ gave for affording little weight to the treating source opinions was plaintiff's inconsistent statements about the nature, frequency and severity of his substance abuse which, according to the ALJ, called into question plaintiff's truthfulness with his doctors about his medication compliance and alcohol use.  (Tr. 23).  As discussed above, the ALJ's decision that plaintiff was noncompliant with his medication lacks substantial support in the record evidence.  However, plaintiff has given inconsistent statements about his alcohol use. While plaintiff testified at the hearing that he stopped drinking in early 2004 (Tr. 265-66), the record shows plaintiff admitted to Dr. Chiappone that he drank in 2005 (Tr. 129) and again in

---

[5]Because the ALJ's conclusion that plaintiff is noncompliant with medication is unsupported by substantial evidence, her conclusion that benefits would be denied under SSR 82-59 (Tr. 23) is likewise flawed.   Social Security Ruling 82-59 explains the circumstances under which the Commissioner may deny benefits to an otherwise disabled individual on the basis that the claimant has failed to follow prescribed treatment "that could be expected to restore their ability to work."  Here, there is no substantial evidence to support the ALJ's conclusion that plaintiff has failed to follow prescribed treatment, or that the treatment was expected to restore his ability to work.

February 2006 (Tr. 154, discharge diagnosis: "alcohol intoxication").[6] While the ALJ was certainly free to consider plaintiff's inconsistent statements and history of alcohol abuse in assessing plaintiff's credibility, the ALJ points to no evidence post-February 2006 showing any evidence of continued alcohol use which would affect Dr. Tadepalli's or Ms. Lockett's 2008 assessments two years after the last note of alcohol use. Therefore, the ALJ's reliance on 2006 evidence of substance abuse as a basis for discrediting the treating source opinions is without substantial support in the record.

As to the last reason for giving little weight to Dr. Tadepalli's opinions, the ALJ stated Dr. Tadepalli's "reports are internally inconsistent, do not address the claimant's noncompliance, and are inconsistent with treatment notes showing the claimant does well when in treatment and compliant with medications." (Tr. 23, citing Tr. 243, 245). The "noncompliance" issue is discussed above and will not be repeated. With respect to the inconsistency of Dr. Tadepalli's reports, the ALJ noted a conflict between Dr. Tadepalli's September 2008 report (when he found that plaintiff had no significant limitations in four out of five mental functions related to social interaction, and did not rate him in the fifth) (Tr. 245) and Dr. Tadepalli's October 2008 report (when he opined that plaintiff had marked or extreme difficulty relating to others) (Tr. 242-43).

The inconsistency of a treating physician's opinion is a factor the ALJ may consider in determining the weight to accord the opinion. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). Thus, the ALJ properly considered the inconsistencies between Dr.

---

[6]The Court agrees with the Commissioner that while the ALJ's citation to Exhibit 3F (Tr. 21, 163) does not show current alcohol abuse, the ALJ mistakenly cited to the wrong exhibit when referring to the February 23, 2006 incident. The record shows that in February 2006 plaintiff went to the emergency room after he was assaulted, reported drinking alcohol daily, and was found by the attending physician to be "clinically intoxicated." (Tr. 153-54).

Tadepalli's two reports in discounting his opinions. Nevertheless, "[a] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' *not that the opinion should be rejected*." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 (emphasis added). "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); 416.927(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(3)-(6), 416.927(d)(3)-(6); *Wilson*, 378 F.3d at 544.

The ALJ's decision does not reflect an analysis of these factors. Dr. Tadepalli is a medical doctor specializing in psychiatry. While Dr. Tadepalli may have only examined plaintiff on one occasion before giving his mental RFC, the frequency with which Dr. Tadepalli has examined plaintiff is but one factor the ALJ must consider in assessing weight to the treating physician and, as pointed out above, Dr. Tadepalli did have the benefit of plaintiff's progress notes for a period of years prior to rendering his opinion. In addition, Dr. Tadepalli's assessment that plaintiff is extremely limited in his ability to interact with others and deal with work stresses (Tr. 242) is consistent with the other record evidence.

Plaintiff's case manager, Danielle Lockett, testified that plaintiff must be accompanied by someone, usually herself or plaintiff's cousin, while out in the community. (Tr. 277, 269). Ms.

24

Lockett related an incident where she accompanied plaintiff to a meeting at an agency where she had to keep redirecting him, as he was becoming agitated when he had to wait for service. (Tr. 280-281).

Also consistent with Dr. Tadepalli's assessment was Nurse Practitioner Wheeler's February 2006 assessment showing "marked" limitations in plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and "moderate" limitations in most other areas of work-related functioning. (Tr. 203).

Likewise, consultative examiner Dr. Chiappone found a "moderate" impairment in plaintiff's ability to carry out and persist over time as well as a "moderately" reduced stress tolerance, with a GAF of only 48. (Tr. 131).

While the ALJ stated she gave "little weight" to Dr. Tadepalli's opinions, the ALJ's decision does not reflect the ALJ's analysis of the regulatory factors to enable this Court to meaningfully review the ALJ's conclusion. The Court cannot say that Dr. Tadepalli's opinion "is so patently deficient that the Commissioner could not possibly credit it" to excuse the ALJ's failure in this case. *Wilson*, 378 F.3d at 547. By failing to consider the factors listed in 20 C.F.R. § 416.927(d)(2) in determining the weight to give Dr. Tadepalli's opinions, the ALJ's rejection of the treating physician's RFC assessment is not supported by substantial evidence. The ALJ's decision in this respect constitutes legal error warranting a reversal and remand of this case for reconsideration of plaintiff's RFC, with proper analysis of the weight to be given Dr. Tadepalli's residual functional capacity questionnaire consistent with the treating source regulation. 20 C.F.R. § 416.927(d); *Wilson*, 378 F.3d at 546.

**II. ALJ's reliance on the non-examining state agency medical consultant and vocational testimony based thereon**

Plaintiff contends the ALJ erred by relying on the RFC assessment of a non-examining state agency consultant and relying on a hypothetical question that failed to accurately portray plaintiff's limitations.

In this case, the ALJ gave "significant weight" to the RFC assessment of the state agency medical consultant. The ALJ found this assessment was "most consistent with the record" and "adequately acknowledges and accommodates the claimant's moderate difficulty interacting and relating to others and his moderate difficulty focusing and concentrating." (Tr. 23).

Although the opinion of a state agency consultant "may be entitled to greater weight than a treating source medical opinion if the State agency . . . consultant's opinion is based on a review of a complete case record," Social Security Ruling 96–6p, such is not the case here. The state agency medical consultant[7] offered his RFC opinion in February 2006, before the majority of the medical evidence was entered in the record, including the reports of treating psychiatrist Dr. Tadepalli (Tr. 241-45), treating Nurse Practitioner Wheeler's mental functional capacity assessment (Tr. 203-204), and mental health treatment records from CORE Behavioral Health from August 22, 2005 through June 13, 2006[8] and June 19, 2007 through October 8, 2008. (Tr. 214-239, 246-254). Therefore, this non-examining opinion was not based on a complete record,

---

[7]As the Commissioner and plaintiff note, there is no indication in the record of the reviewer's professional qualifications. The Commissioner requests the Court to take judicial notice that the State of Ohio recognizes William Benninger as a licensed psychologist. *See* https://license.ohio.gov/Lookup/SearchDetail.asp?ContactIdnt =2939129&DivisionIdnt=83&Typ. Even assuming the consultant is a licensed psychologist, the ALJ's reliance on the state agency consultant's RFC assessment is not substantially supported.

[8]The request for records from the state agency to Core Behavioral Health was made on June 16, 2006. (Tr. 214). Therefore, the state agency medical consultant did not have these records when he assessed plaintiff's RFC on February 13, 2006. (Tr. 150).

and does not provide substantial evidence for rejecting the treating source opinions or for the

ALJ's RFC opinion. *See Blakley*, 581 F.3d at 409 ("we require some indication that the ALJ at

least considered these facts before giving greater weight to an opinion that is not based on a

review of a complete case record"). *See also Shelman*, 821 F.2d at 321; *Harris v. Heckler*, 756

F.2d 431, 435 (6th Cir. 1985).

In connection with this assignment of error, plaintiff contends the ALJ erred by relying on

vocational testimony based on a hypothetical question that failed to accurately portray plaintiff's

limitations. The Court agrees.

At Step 5 of the sequential evaluation process, the burden shifts to the Commissioner "to

identify a significant number of jobs in the economy that accommodate the claimant's residual

functional capacity (determined at step four) and vocational profile." *Jones v. Commissioner of

Social Sec.,* 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner may meet his burden through

reliance on a vocation expert's testimony in response to a hypothetical question. To constitute

substantial evidence in support of the Commissioner's burden, the hypothetical question posed to

the vocational expert must accurately reflect the claimant's physical and mental limitations. *See

Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010); *Howard v.

Commissioner of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002); *Varley v. Secretary of Health &

Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).

Here, the ALJ's hypothetical question to the vocational expert was based on the RFC

opinion of the non-examining state agency consultant which included the qualifications that the

individual perform only simple tasks, did not have "great difficulties with concentration," "might

have some difficulties working with the public or large groups," and "should be able to relate

adequately to coworkers on a one on one basis." (Tr. 150, 284). In response, the vocational expert testified that an individual with those limitations could performed cleaning and clerical jobs at both the light and medium exertional levels. (Tr. 284-85).

As explained above, the ALJ's RFC assessment is based on a state agency assessment which did not consider any of the mental health treatment plaintiff received at CORE (which consistently reflects plaintiff suffers from "poor" concentration, *see* Tr. 232, 227, 222, 203, 241, 249) or the limitations imposed by Dr. Tadepalli (including that plaintiff had no useful ability to deal with work stresses). The hypothetical propounded by the ALJ, based on the state agency RFC, therefore suffers from the same problems as the RFC. Accordingly, the ALJ erred by relying on this vocational testimony to carry her burden at Step 5 of the sequential evaluation process. *See White v. Commissioner of Social Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's physical and mental impairments).[9]

Likewise, the ALJ asked the VE to consider a hypothetical question based on the limitations set forth in consultative examiner Dr. Chiappone's report. (Tr. 285-86). In response,

_____

[9]The Court notes that the Sixth Circuit has held that a hypothetical question limiting the claimant to simple, unskilled, routine jobs did not sufficiently account for moderate deficiencies in concentration, persistence, and pace. *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010) (citing *Edwards v. Barnhart*, 383 F. Supp.2d 920, 930-31 (E.D. Mich. 2005) (hypothetical limiting claimant to "jobs entailing no more than simple, routine, unskilled work" not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."); *Whack v. Astrue*, No. 06-4917, 2008 WL 509210, at *8 (E.D. Pa. Feb. 26, 2008) (citing cases for the proposition that hypothetical restrictions of "simple" or "low-stress" work do not sufficiently incorporate the claimant's medically established limitations where claimant has moderate deficiencies in concentration, persistence or pace)). Likewise, this Court has also recognized that where the ALJ's hypothetical failed to include the plaintiff's moderate deficits in memory, attention, and concentration, the vocational expert's testimony does not constitute substantial evidence that the plaintiff can perform her past relevant work. *See Renn v. Commissioner of Social Sec.*, Case No. 1:09-cv-319, 2010 WL 3365944 (S.D. Ohio August 24, 2010) (Beckwith, J.). Thus, the ALJ's hypothetical in this case which limited plaintiff to simple step tasks does not account for plaintiff's moderate deficiencies in concentration, persistence and pace.

the VE testified that plaintiff could perform the same janitorial and clerical jobs previously listed. *Id*. However, when cross-examined by plaintiff's counsel based on Dr. Chiappone's limitations that an individual who had a "moderate" impairment in the ability to carry out and persist over time–which the VE stated would require more than usual help from supervisors–coupled with Dr. Chiappone's additional limitation of a "moderate" limitation in stress tolerance, the VE testified that such a person would very possibly not make it through a probationary work period. (Tr. 288-89). The ALJ failed to consider this combination of limitations imposed by Dr. Chiappone, even though the ALJ stated she gave significant weight to Dr. Chiappone's opinion. (Tr. 23). Therefore, to the extent the ALJ relied on the vocational expert's earlier testimony without accounting for the impact of moderate limitations in persistence and stress tolerance expressed by Dr. Chiappone on plaintiff's ability to work, the ALJ's vocational decision is not supported by substantial evidence.

Because the ALJ's hypothetical questions failed to accurately portray plaintiff's mental impairments, the vocational expert's testimony in response thereto does not constitute substantial evidence that plaintiff could perform the jobs identified by the VE. Therefore, plaintiff's second assignment of error should be sustained.

### III. Listing 12.04(C)(2) and (3)

Plaintiff contends the ALJ erred by not finding he meets Listing 12.04(C)(2) and (3). To qualify for a disability under Listing 12.04(C), a claimant must provide evidence of:

> C. [A] [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

> 1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, Part A § 12.04. Episodes of decompensation are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Listing § 12.00(C)(4).

The ALJ determined that plaintiff did not meet either Listing 12.04(C)(2) or (C)(3). The ALJ stated that the record does not show "such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [plaintiff] to decompensate." (Tr. 19). The ALJ also noted that while the record showed plaintiff required the assistance of a case manager and that he relied on his cousin, he does not require a highly supportive living arrangement. (Tr. 19). The ALJ stated that plaintiff has not been in a mental institution or hospital for any extended period and has not been in a halfway house, group home, or other care facility. *Id.* The ALJ also noted that plaintiff lived alone for some time and managed even without case management support at a time when he was actively abusing alcohol. *Id.*

Plaintiff contends that the reports from his treating sources, including his case manager, show that despite compliance with treatment, he has an extremely low tolerance for stress, and extreme difficulty interacting with others, focusing, and concentrating for purposes of Listing

30

12.04(C)(2).  Plaintiff argues that he has such a profound limitation in his ability to interact with others in the community that he cannot effectively function independently outside the home. (Doc. 7, citing Tr. 241-44, 277).  Plaintiff further argues the ALJ erred when she required evidence that plaintiff spent time in a mental institution or other highly structured facility to meet Listing 12.04(C)(3) because a "highly supported living arrangement" need not mean institutionalization.

The Commissioner argues that none of the opinions offered by plaintiff's treating sources state that plaintiff meets Listing 12.04(C).  (Doc. 6 at 10).  The Commissioner asserts that the limitations set forth in Dr. Tadepalli's and Nurse Practitioner Wheeler's RFC assessments neither explicitly nor implicitly show plaintiff meets Listing 12.04(C).  The Commissioner also contends that Nurse Practitioner Wheeler rated plaintiff's functioning in 2005 and 2006 at five ("moderate") and six on scale of zero ("poor") to ten ("best") (Tr. 220-21, 223, 228), and that Dr. Rosenthal rated plaintiff's functioning in June 2007 at six on a scale of zero ("poor") to ten ("best") (Tr. 253-54), showing plaintiff was functioning at a higher level than required by the Listing.  In addition, the Commissioner points to the state agency reviewer's assessment that plaintiff did not meet the "C" criteria of the Listing.  (Tr. 145).

Plaintiff is correct that Listing 12.04(C) does not require institutionalized living to meet the requirements of 12.04(C)(3).  Listing 12.00F states in pertinent part:

> Effects of structured settings.  Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure.  Highly structured and supportive settings *may also be found in your home.*  Such settings may greatly reduce the mental demands placed on you.  With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized.

Listing § 12.00(F) (emphasis added).  Therefore, to the extent the ALJ required evidence

showing plaintiff lived in a hospital, mental institution, group home, or other such facility for an

extended period of time, the ALJ erred as a matter of law and her Listing decision must be

reversed.

Nevertheless, aside from the evidence that plaintiff's case manager and cousin assist

plaintiff when he leaves his home, it is unclear what other structures or environmental supports

plaintiff relies upon for his Listing 12.04(C)(3) argument.  Nor is the Court persuaded that the

reports from plaintiff's treating sources clearly show that plaintiff is unable to function

effectively outside the home.  The Court is simply not in a position to assess whether, as a factual

matter in the first instance, a minimal increase in mental demands or a change in plaintiff's

environment would be predicted to cause plaintiff to decompensate for purposes of Listing

12.04(C)(2).  Accordingly, the Court concludes this matter should be remanded for further

proceedings, including the retention of a medical expert to assist the ALJ's evaluation of whether

plaintiff's impairments meet or equal Listing 12.04(C).

## IV.  Remand for further proceedings

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for

further proceedings consistent with this Report and Recommendation.  All essential factual

issues have not been resolved in this matter, nor does the current record adequately establish

plaintiff's entitlement to benefits as of his alleged onset date, especially in view of the evidence

of plaintiff's alcohol use in 2005 and 2006.  *Faucher,* 17 F.3d at 176.  In addition, the Court

notes that vocational errors generally require a remand for further proceedings under Sentence

Four of 42 U.S.C. § 405(g).  *See Ealy*, 594 F.3d at 517; *Renn*, 2010 WL 3365944, at *6.

Accordingly, this matter should be remanded for further proceedings, including a reassessment of the weight to the treating source opinions, reconsideration of whether plaintiff meets or equals Listing 12.04(C), reconsideration of plaintiff's RFC assessment, and vocational considerations consistent with this decision.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/10/2011_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TERRY LYNN PUCKETT,      Case No. 1:10-cv-528
  Plaintiff          Barrett, J.
              Litkovitz, M.J.

 vs

COMMISSIONER OF
SOCIAL SECURITY,
  Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).